# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | |
|---|---|
| **ZOLO AGONA AZANIA,** | ) |
| **fka Rufus Lee Averhart,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )    **No. 3:09 CV 499** |
| | ) |
| **SUPERINTENDENT, INDIANA** | ) |
| **STATE PRISON,** | ) |
| | ) |
| **Respondent.** | ) |

## <u>OPINION AND ORDER</u>

Petitioner Zolo Agona Azania, a prisoner confined at the Indiana State Prison, submitted a petition[1] for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. (DE # 1.) Azania is currently serving an aggregate sentence of 74 years, imposed by the Allen Superior Court, for committing armed robbery and murdering a police officer during the course of the robbery.

---

[1] On December 11, 2008, Azania submitted a petition for writ of habeas corpus that was filed as 3:08 CV 574. The court, however, struck that petition and dismissed the case on April 2, 2009, concluding that the petition was premature and that the statute of limitations would not preclude Azania from being able to refile a habeas petition. When he filed the petition that was used as the case opening document in this case, he entitled it "petition for writ of habeas corpus." (DE # 1.) In this opinion and order, the court will refer to this document as "the petition."

# I.    Background

On May 5, 1982, the Petitioner, under the name Rufus Averhart,[2] was convicted of murder and felony murder of a police officer, and was sentenced to death. The Indiana Supreme Court affirmed both the conviction and sentence on direct appeal. *Averhart v. State*, 470 N.E.2d 666, 697 (Ind. 1984). Azania sought post-conviction relief, which the trial court denied. On appeal, the Indiana Supreme Court concluded that Azania was denied effective assistance of counsel at the sentencing phase, and remanded the case for imposition of a term of years or for a new penalty phase. *Averhart v. State*, 614 N.E.2d 924, 935 (Ind. 1993). On remand, Azania was again sentenced to death, and the Indiana Supreme Court affirmed the sentence on appeal. *Azania v. State*, 730 N.E.2d 646, 655 (Ind. 2000).

Azania filed a successive petition for post-conviction relief and the Indiana Supreme Court authorized "the filing of Azania's successive petition for post-conviction relief but only for the purpose of presenting his first claim regarding the Allen County jury selection system." *Azania v. State*, 738 N.E.2d 248, 252 (Ind. 2000). The Supreme Court further ordered that this successive petition for post-conviction relief "shall be consolidated with the proceedings in Azania's separate successive petition for post-conviction relief alleging newly discovered evidence relevant to the guilt phase of his murder trial, which was authorized to be filed by our order of October 12, 2000." *Id.*

---

[2] Averhart later changed his name to Zolo Agona Azania, and this court will refer to him as Azania in this opinion and order. (DE # 1 at 5.)

The trial court denied relief on Azania's successive petitions for post-conviction relief. On appeal the Indiana Supreme Court affirmed the trial court in part, but held that Allen County's computerized jury selection system did not substantially comply with Indiana's jury selection statute, requiring that the death sentence be vacated and that a new penalty phase be conducted. *Azania v. State*, 778 N.E.2d 1253, 1263 (Ind. 2002).

On remand, the trial court granted Azania's motion barring the State from seeking the death penalty. On appeal from that order, the Indiana Supreme Court reversed the trial court, and remanded the case for a new penalty phase that would include the possibility of a death penalty. *Azania v. State*, 865 N.E.2d 994, 1010 (Ind. 2007). The State sought rehearing, and the Supreme Court granted "the State's petition for rehearing and [held] that Azania should be re-sentenced under the post–2002 death penalty statute, but without the availability of [life without parole]." *State v. Azania*, 875 N.E.2d 701, 705 (Ind. 2007). On remand, the trial court sentenced Azania to an aggregate term of 74 years pursuant to a stipulated sentencing agreement. (DE # 16-1 at 58.)

## II.    Discussion

This petition is governed by the provisions of the Anti-Terrorism and Death Penalty Act of 1996, *see Lindh v. Murphy*, 521 U.S. 320, 336 (1997), which allows a district court to issue a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In reviewing a petition for federal collateral relief from a state court judgment of conviction, this court

must presume as correct the facts as found by the state courts. 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Ruvalcaba v. Chandler*, 416 F.3d 555, 559–60 (7th Cir. 2005). The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Ruvalcaba*, 416 F.3d at 559–60.

The Indiana Supreme Court set forth the facts regarding Azania's crimes on direct appeal as follows:

> The facts tend to show that on August 11, 1981, at about noon, the Gary National Bank at 3600 Broadway, Gary, Indiana, was robbed by three men. Gary Police Officer Lieutenant George Yaros was killed by gunfire in a shootout with the robbers as they attempted their escape.
>
> Witness William E. Pendleton was in the Bank parking lot by his automobile when he saw three masked people, one of them quite well dressed, run toward the Bank and enter it. When Pendleton observed this, he did not enter the Bank. Elton Bourseir, a security guard at the Bank, stated that an armed man came up behind him, took his gun, and pushed him into the lobby, telling him to lie on the floor. Bourseir did so. The man was about 6'3", a very dark complexioned black man with an "afro" hairdo, sunglasses, a light blue coat, and black gloves. The firearm taken from Bourseir was a .38 Colt nickel-plated, pearl handled, two inch revolver. Employees of the Bank testified that the three men came into the branch with weapons drawn, had everyone lie down on the floor, and took money belonging to the Bank. Louis Lepp, the Assistant Manager of the Bank branch, testified to these events. As he lay down, he reached for an alarm button and set off the alarm. This button also activated a Diebold security camera. The alarm button activated an alarm in the office of the alarm company and notified the police department. Mavis Reeves testified she was sitting at her typewriter where she could see the back door. The back door opened and a man with a gun ran in and jumped over the counter, holding the gun to a guard's head. Two other men with guns and masks ran in. The first man was pushing the guard to get him out into the lobby. This man had a large gun in his hands and was wearing a blue suit. One of the other two men wore a shirt and vest and the third wore a plaid shirt. When it was apparent the police were on the scene, the three men started to leave the Bank. Mrs. Reeves saw them standing between the two sets of doors at the back of the Bank, shooting out. The man in the blue suit still had the long gun. Witnesses on the outside, including

Pendleton, saw Officer Yaros pull up, block the exit lane of the Bank parking lot in a marked police car, and step out in an attempt to apprehend the robbers. He was in full police uniform. All three of the perpetrators opened fire on him and he fell to the ground. He was speaking into his walkie-talkie as he fell and other police officers testified they received a dispatch from him that indicated there was a robbery in progress and he needed help. The three robbers then ran past the squad car to get to their own vehicle. Two of them, the one in the sleeveless vest and the one in the plaid shirt, entered the car. The one in the blue suit went over to the police officer and kicked his pistol away from him. This individual then held his hand gun close to the police officer and fired another shot into his body. All three of them then left hurriedly in a light blue sedan type automobile. Officer Walter Jagilea was on the scene in a marked vehicle and saw the shooting of Yaros. He advised Officer Pastoret as to the identity of the two-tone blue four-door Ford in which the perpetrators were making their escape and Pastoret closely pursued them. Jagilea attempted to give aid to Yaros. Corporal Charles Oliver, of the Patrol Division of the Gary Police Department, was close behind Pastoret in pursuing the blue Ford. The subjects in the blue Ford leaned out of the side windows of the automobile, and shot back at the police officers while the pursuit took place. The vehicles reached speeds of 80 to 100 m.p.h. while going through the streets of Gary. The blue car finally struck a tree and was forced to stop. One of the occupants jumped out and ran south down 25th Street. Pastoret continued to pursue the automobile and finally apprehended defendants North and Hutson. Oliver pursued the man on foot and saw that this person was wearing a dark blue shirt, a light blue jacket, and light blue sports trousers. Oliver saw the man throw a wig to the ground while running down the alley and later recovered this wig. He saw the suspect run to the back of the second house on the left, which had a six foot fence at the rear, and saw the suspect jump over it. Oliver ent through a gate and then realized too much time had passed to pursue the suspect any further on foot, so he jumped back into his automobile and circled to 26th Avenue. The suspect was no longer in sight but there was a street crew working and Oliver asked them if they had seen the man. One of the workers came up and gave Oliver directions, stating that the man he wanted had gone east to Buchanan Street. This witness was James Charles McGrew, who stated he was working for Vulcan Basement Waterproofing at Lincoln Street around 26th Avenue when he heard gunshots. McGrew looked up twice. The second time he saw a black man in a blue jacket. The black man reached into the waist band of his trousers, removed a pistol and placed it in the bushes. After he walked four steps further and placed a bag into the bushes, he walked a few more steps and put his jacket into the bushes. McGrew watched the man cross the street very slowly and start walking towards the

next corner. At this point, the police officer came by and McGrew advised him as to the direction in which this man had gone. Oliver then went in that direction and found defendant Averhart slowly walking north. His clothing closely matched that of the suspect he had been following. Oliver stopped him and handcuffed him. McGrew identified Averhart as being the same man he saw come by and place the items he had described into the bushes. Oliver recovered the light blue jacket in the bushes of the yard at 2532 Lincoln through which Averhart had fled. A six-shot Colt revolver was found wrapped inside the jacket. This was the gun taken from security guard Bourseir at the Bank. The clothing recovered from the bushes was identified by eye witnesses as that worn by Averhart during the robbery and murder. There also was a fragment of a bullet in the leg of Averhart's trousers. James Springfield was a security officer, working that day at the supermarket at 1421 West 25th Street in Gary, the scene of Averhart's course while being chased on foot by Oliver. He found a .44 magnum pistol behind the store. This he turned over to the police officer Elijah Cole. Witness Donald McDuffie testified that he had sold this weapon to Rufus Averhart. Ballistics tests indicated that this weapon had fired the shot that caused the death of Yaros. Lewis Lepp, the assistant general manager of the Bank, who had activated the Diebold bank camera, testified that he had checked the camera that morning and said it was loaded and ready to operate. Security officer Razumich removed the film and it was processed by Captain Phil Wieklinski. There were 309 frames showing activities of the robbery as described above. Mrs. Reeves viewed these photographs and was able to identify many of the scenes as those she observed. She particularly identified two through thirty three, 144 to 146, 200 to 213, 265 to 285, and 292 to 296, as corresponding to, and truly and accurately depicting what she saw during the incident. All of the photographs were admitted into evidence. There were also handguns, a shotgun, and over $19,000.00 taken from the Bank, that were recovered from the blue Ford pursued by Pastoret and Oliver and from which Hutson and North were arrested. The money included several twenty dollar bills which were especially packaged and held in reserve in the teller's cage as "bait money" with the serial numbers of these bills marked and kept on record by the Branch Manager and the security office.

*Averhart v. State*, 470 N.E.2d 666, 673-75 (Ind. 1984). Following the Indiana Supreme

Court's affirmance of his conviction and sentence, petitioner filed his first petition for

post-conviction relief. On appeal from the denial of post-conviction relief, the Indiana Supreme Court found the following facts:

> The facts are: On August 11, 1981, at approximately noon, three men robbed the Gary National Bank in Gary, Indiana. The police were informed that a robbery was in progress, and Police Officer George Yaros responded to the call. He was killed in an exchange of gunfire with the robbers as they exited the bank.
>
> One of the robbers wore a blue suit. All three robbers opened fire and Yaros fell to the ground. The man wearing the blue suit walked back, kicked Officer Yaros's gun away from him, and then fired another shot into the officer. The three robbers left in a two-tone blue sedan. A high-speed chase ensued during which the robber's car stopped, and the man in the blue suit exited the car and discarded an afro wig he was wearing. The pursuing officer then momentarily lost view of him. However, workers at a construction site nearby informed the officer which way the man had gone and also that they had seen the man place a pistol, a bag, and his jacket in some bushes.
>
> The officer soon caught sight of appellant and identified him by his clothing. Appellant was arrested and the revolver and other discarded items were recovered from the bushes. A security officer also recovered a .44 magnum pistol from behind a supermarket along the route of the robber's escape. A witness testified that this was the .44 magnum pistol that he had sold to appellant. Ballistics tests indicated that this gun had fired the shot which killed Officer Yaros.
>
> In the original record there are 309 photographs taken by the bank security camera which were introduced in evidence. From an examination of these exhibits, it becomes apparent that the three robbers readily can be identified. The photographs show that only one of the robbers was wearing a suit and only one had an afro hair style. It also is apparent that all three robbers were wearing gloves. The last series of photographs, which were taken within seconds of Officer Yaros's death, show the same three robbers exiting the bank, with only one of them wearing a suit and an afro hairdo.

*Averhart v. State*, 614 N.E.2d 924, 926-27 (Ind. 1993).

### III.   Petitioner's Request to Expand the Record

With his traverse, Azania has submitted a filing entitled "Submission of

Required Documents in Support of Habeas Petition and Request for Evidentiary

Hearing." (DE # 20-2 at 2.) Azania argues that "Habeas Corpus Rule 7(a)[3] of the Rules

Governing Title 28 U.S.C. § 2254 cases expressly permits the habeas court to allow the

'inclusion of additional material relevant to the merits of the petition.'" *Id.* However,

federal law places strict limits on a district court's ability to consider evidence that was

not included in the State court record. "Because § 2254(e)(2) restricts a petitioner's

attempts to supplement the factual record, [the petitioner] must satisfy that provision's

requirements before he may place new factual information before the federal court."

*Boyko v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001). *See also Owens v. Frank*, 394 F.3d 490, 499

(7th Cir. 2005).

> If the applicant has failed to develop the factual basis of a claim in
> State court proceedings, the court shall not hold an evidentiary
> hearing on the claim unless the applicant shows that-
>> (A) the claim relies on-
>>> (i) a new rule of constitutional law, made
>>> retroactive to cases on collateral review
>>> by the Supreme Court, that was
>>> previously unavailable; or
>>> (ii) a factual predicate that could not have
>>> been previously discovered through the
>>> exercise of due diligence; and
>> (B) the facts underlying the claim would be sufficient to
>> establish by clear and convincing evidence that but for
>> constitutional error, no reasonable factfinder would

---

[3] Rule 7(a) provides that "the judge may direct the parties to expand the record by submitting additional materials relating to the petition."

have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Here, Azania is attempting to submit 39 documents. Pursuant to § 2254(e)(2), he must demonstrate either that the document is relevant to a claim based on a new, retroactive rule of Constitutional law or is new evidence that could not have been discovered previously through the exercise of due diligence. Then, he must demonstrate by clear and convincing evidence that had the information in the tendered document(s) been available at the time of his trial, no reasonable factfinder could have found him guilty.

Azania has not attempted to provide any explanation for how any of his tendered documents meet this standard. Rather he merely states that he "wish[es] to only expand the record to include essential documents to assist the habeas corpus court judge to render a proper decision under federal law *in light of facts presented in the court room and before the trial judge.*" (DE # 20-2 at 2 (emphasis added).) However, the "facts presented in the court room and before the trial judge" are already included as a part of the State court record. So this argument presents no basis for expanding the record to include the tendered documents.

Additionally, the court's review of these documents in light of the requirements of § 2254(e)(2), show that they cannot be added to this record or considered as a part of the resolution of this case. First, given that none of Azania's claims are based on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme

Court, none of his tendered documents are admissible based on that prong of the test. Second, it is clear that at least 32 of these documents are either not newly discovered or could have been previously discovered through the exercise of due diligence. Seven are newspaper articles that were published in the 1980's and 1990's (DE ## 20-2 at 32, 33, 35, 36, 71-72, 77-78, and 79). Eight are letters written to or by Azania in the 1980's and 1990's (DE ## 20-2 at 28-29, 30-31, 34, 39, 40, 42, 56, and 57). Two are pattern jury instructions (DE ## 20-2 at 24-25 and 26-27). Seven are court documents, pleadings, motions, orders, or transcripts (DE ## 20-2 at 7-10, 43-50, 53-55, 58-64, 66-70, 80, and 81-87); and eight are other documents that are already included in the State court record (DE ## 20-2 at 11-13, 14-17, 18, 19, 65, 73-74, 75, 76). The June 11, 1990, Affidavit of Alvin Montgomery (DE # 20-2 at 51-52) is not newly discovered because its contents are consistent with, albeit less detailed, the testimony of Alvin Montgomery during his deposition on February 4, 1992, which is a part of the State court record.

Of the remaining six documents, even if they have been newly discovered, none would have prevented a reasonable factfinder from being able to have found Azania guilty. The Arrest Information Form (DE # 20-2 at 6) shows when he was taken into custody by the Gary Police Department and when he was transferred to the Lake County Jail in Crown Point in August 1981. The handwritten prosecutor's notes (DE # 20-2 at 20-22) briefly describe three witness interviews. The drawing of ankle lock weights (DE # 20-2 at 23) is a drawing of ankle weights with a lock. The two City of Gary internal memos (DE ## 20-2 at 37 and 38) describe Donald McDuffie's refusal to

work on March 27, 1986, (nearly 4 years after Azania was convicted) and his 10 day suspension without pay as a result. The May 16, 1987, Affidavit (DE # 20-2 at 41) of John McGrath, a deputy prosecutor during Azania's trial, explains the State's strategic decision to call the victim's wife to the stand as their first witness. None of these documents are the type of "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" *Schlup v. Delo*, 513 U.S. 298, 324 (1995), that qualify as the clear and convincing evidence required by 28 U.S.C. § 2254(e)(2) demonstrating that "no reasonable factfinder would have found the applicant guilty of the underlying offense."

Azania's request for an evidentiary hearing fairs no better. "[A] petitioner seeking an evidentiary hearing must show diligence and, in addition, establish her actual innocence by clear and convincing evidence. §§2254(e)(2)(A)(ii), (B)." *McQuiggin v. Perkins*, 569 U.S. __, __; 133 S. Ct. 1924, 1934 (2013). Here, not only has Azania not demonstrated actual innocence, the evidence against him was overwhelming.

> [T]he evidence of his guilt for murder and robbery were overwhelming. Although appellant attempts to argue that he was not properly identified either as participating in the robbery or as the triggerman, these contentions are almost ludicrous in the face of the overwhelming evidence presented to the jury in this case. The 309 photographs taken by the bank security camera gave the jury the opportunity to look at the perpetrators and identify appellant as one of them beyond any reasonable doubt.
>
> The photographs also show that appellant is the only one wearing an afro hair style and a suit. The testimony of eyewitnesses was that the man wearing the suit returned to the fallen officer, kicked his gun aside, and fired another shot into his prostrate body. Appellant was pursued and captured wearing the same suit. The gun, which

> ballistics showed to be the murder weapon, was found discarded along appellant's path of flight. [This is] an abundance of evidence pointing unerringly to the guilt of appellant . . . .

*Averhart v. State*, 614 N.E.2d at 927-28. Therefore Azania's request to expand the record and conduct an evidentiary hearing will be denied.

## IV.    Analysis

The evidence that Azania participated in the robbery of the Gary National Bank at 3600 Broadway, Gary, Indiana, on August 11, 1981, and that he participated in the murder of Officer Yaros during the course of that robbery, is overwhelming. There is no actual innocence claim lurking in this case. The question of the appropriate sentence for Azania, however, was more controversial, and led to repeated appeals to the Indiana Supreme Court. Azania's petition for a writ of habeas corpus raises nineteen separate grounds, which this court will now address.

### A.    Whether the State Improperly Amended the Charging Information

In ground one of his petition for a writ of habeas corpus, Azania argues that, "[t]he State improperly amended the charging [i]nformation." (DE # 1 at 28.) In his traverse he argues that "the original charging information had been illegally amended" in violation of Indiana Code § 35-3.1-1-5(e) (Burns Repl. 1979). However, as the United States Supreme Court has explained,

> The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). And we have repeatedly held that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

12

*Wilson v. Corcoran*, 562 U.S. 1, 4 (2010) (parallel citations omitted). Therefore the argument about State law presents no basis for habeas corpus relief.

Nevertheless, Azania also argues that, "[t]he State Court decision is contrary to federal law, because neither an indictment nor an information can legally be amended, adding different theories of offenses." (DE # 1 at 28.) Without regard to whether this assertion is legally accurate, it is not a basis for habeas corpus relief in this case because it is not factually accurate. That is to say, neither the information nor the indictment was amended in Azania's case. As the Indiana Supreme Court explained, "[t]he defendant was initially charged by information, but the prosecutor dismissed the information and filed an indictment after the grand jury subsequently returned an indictment . . . ." *Azania v. State*, 730 N.E.2d 646, 648 (Ind. 2000).

> The prosecuting attorney of Lake County . . . indicated it was his practice where he was seeking the death penalty to have a grand jury hear the matter and be given an opportunity to return indictments. He felt, even though he had the authority to charge the defendants and to seek the death penalty without the aid of the grand jury, it was advisable and desirable to have the community feeling demonstrated by the actions of the grand jury. He therefore presented the entire case to the grand jury.

*Averhart v. State*, 470 N.E.2d 666, 678 (Ind. 1984).

Thus, the information was not *amended*, it was *dismissed*. The information was not *amended* by the indictment of the grand jury, the information was *superceded* by the indictment. "A superceding indictment is itself the action of the grand jury, and thus, the rule against amendments has no application." 1 Charles Alan Wright and Andrew D. Leipold, *Federal Practice & Procedure Criminal* § 128 (4th ed. 2008) (footnote 46

collecting cases). Though a superceding indictment can itself be challenged for any of the same reasons as can any indictment (which Azania did), the mere fact that it replaced a previous information is not, in and of itself, a Constitutional violation nor a basis for habeas corpus relief.

### B. Whether the Grand Jury Received Improper Information

In ground two of his petition for writ of habeas corpus, Azania asserts that his grand jury received inadmissible, irrelevant, and prejudicial information. (DE # 1 at 29.) He presented this ground to the state courts in his direct appeal.

Respondent argues that this claim is barred by procedural default because the Indiana Supreme Court disposed of it based on waiver, which is an independent and adequate state law ground, citing *Coleman*, 501 U.S. at 729-32. (DE # 17 at 19.) The doctrine of procedural default precludes a federal court from reaching the merits of a habeas petition if (1) the claim was presented to the state courts, and the state court ruling rested on independent and adequate state procedural grounds, or (2) the petitioner did not fairly present his federal claim to the appropriate state courts, and those state courts would now hold the claim procedurally barred. *Perruquet v. Briley,* 390 F.3d 505, 514 (7th Cir. 2004). "An adequate and independent state ground bars federal habeas review of constitutional claims only if the last state court rendering judgment in the case clearly and expressly states that its judgment rests on the state procedural bar." *Harrison v. McBride*, 428 F.3d 652, 664 (7th Cir. 2005) (citations and quotations omitted).

Respondent is correct that the Indiana Supreme Court noted that Azania did not file a timely motion to dismiss on the grounds of defective grand jury proceedings. *Averhart*, 470 N.E.2d at 677. But the Indiana Supreme Court went on to state that "[a]lthough the trial court's ruling was proper for the reasons we already have given, we will review the contentions raised by Defendant." *Id.* at 677-78. For procedural default to apply, the last state court ruling on the claim must clearly and expressly state that the judgment rests on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 261-62 (1989).

The Indiana Supreme Court did not expressly rely on waiver to dispose of this claim. Rather, it addressed and rejected Azania's grand jury claims on the merits. The Indiana Supreme Court concluded that this claim was insufficient under state law to require dismissal of the indictment, and that his "claim that there was a due process violation based on citation to several federal cases also is without merit." *State,* 470 N.E.2d at 679. The Indiana Supreme Court stated that in none of the cases cited by Azania:

> was there found to be justification for dismissal of the indictments even though the courts found there was misconduct of the federal district attorney in his handling witnesses and testimony before the grand jury. These judgments were held on the basis that there was otherwise competent evidence before the grand jury sufficient to support the indictment, and that the conduct of the prosecutor before the grand jury did not create a defect of constitutional or legal proportions.

*Id.* at 679.

Azania argues that the Indiana Supreme Court unreasonably applied established federal law to this claim. (DE # 1 at 4.) But a federal court may grant habeas relief under the "unreasonable application" clause[4] if the state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be "objectively unreasonable." *Id.* at 520-21. In this case, the Indiana courts reasonably applied applicable federal law to this claim, and Azania has not cited any United States Supreme Court precedent that suggests that his grand jury claim has any merit.

---

[4] Section 2254(d) reads as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

**(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### C. Whether the Allen County Jury Selection System Excluded Eligible African-Americans from the Initial Guilty Phase Jury Pool in 1982

Azania was convicted and sentenced to death in 1982. His original death sentence was overturned by the Indiana Supreme Court, and in 1996, a second penalty phase jury again recommended sentencing him to death. On appeal from his 1996 re-sentencing, Azania argued to the Indiana Supreme Court that the jury pool selection process for his 1996 penalty phase hearing was not in accordance with the Indiana statutes governing jury selection, and that he was denied his Sixth Amendment right to a jury drawn from a fair cross-section of the community. The Indiana Supreme Court agreed that the jury selection process did not comport with the statute, set aside Azania's death sentence, and remanded the case for for a new penalty phase. *Azania*, 778 N.E.2d at 1263.

In ground three of his petition for writ of habeas corpus, Azania asserts that:

> The Indiana Supreme Court found that the computerized jury selection system used in Allen County operated so as to exclude at least 8% of the eligible African-Americans from Azania's jury pool and, based on this finding, vacated Azania's death penalty, but not his conviction.

(DE # 1 at 30.)

The reason the Indiana Supreme Court vacated Azania's 1996 death penalty sentence, but not his 1982 conviction, is that Azania's challenge to the jury selection system dealt with the computerized jury selection system in effect in 1996, not the jury selection system in effect in 1982. (DE # 16-30); *Azania*, 778 N.E.2d at 1257. All of Azania's arguments in his appeal from the denial of his successive petition for post-

conviction relief were directed at the jury selection for his 1996 re-sentencing, and he did not challenge the jury selection for his 1982 trial.

Azania did not challenge the composition of the jury pool or the method for selecting the jury pool for the guilt phase of his 1982 trial in any of the appeals he took to the Indiana Supreme Court. The Exhaustion Doctrine requires that a habeas petitioner "fairly present" his federal claims to the state courts before submitting them to the federal courts, and requires that "both the operative facts and the controlling legal principles must be submitted" to the state courts. *Verdin v. O'Leary*, 972 F.2d 1467, 1472-74 (7th Cir. 1992). (citation and quotation omitted).

Section 28 U.S.C. 2254(b)(1)(A) provides that an application for a writ of habeas corpus by a state prisoner can not be granted unless "the applicant has exhausted the remedies available in the courts of the State." The exhaustion requirement is premised on concerns of comity; the state courts must be given the first chance to address and correct violations of their prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 846-47 (1999); *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claims in one complete round of state review. *O'Sullivan v. Boerckel*, 526 U.S. at 845. Failure to exhaust available state court remedies constitutes a procedural default. *Id.* at 853-54. To avoid a procedural default, a petitioner must have presented his federal claims to the state courts before he seeks federal review of these claims. *Id.* at 844.

Because Azania did not present the arguments he advances in his traverse to the Indiana Supreme Court, these arguments are procedurally defaulted. *Perruquet*, 390 F.3d at 514. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" that prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

A petitioner may also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Under this narrow exception, a habeas applicant must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). A petitioner who asserts actual innocence "must *demonstrate* innocence; the burden is his, not the state's . . . ." *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) (emphasis in original). "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

As the Indiana Supreme court noted:

[T]he evidence of his guilt for murder and robbery were overwhelming. Although appellant attempts to argue that he was not properly identified either as participating in the robbery or as the triggerman, these contentions are almost ludicrous in the face of the overwhelming evidence presented to

the jury in this case. The 309 photographs taken by the bank security camera gave the jury the opportunity to look at the perpetrators and identify appellant as one of them beyond any reasonable doubt.

The photographs also show that appellant is the only one wearing an afro hair style and a suit. The testimony of eyewitnesses was that the man wearing the suit returned to the fallen officer, kicked his gun aside, and fired another shot into his prostrate body. Appellant was pursued and captured wearing the same suit. The gun, which ballistics showed to be the murder weapon, was found discarded along appellant's path of flight. When there is such an abundance of evidence pointing unerringly to the guilt of appellant, this Court cannot justify a reversal on a ground which could have had very little if any bearing upon the jury's decision.

*Averhart*, 614 N.E.2d at 927-28.

This court agrees with the Indiana Supreme Court's analysis; Azania does not have a colorable actual innocence claim. Additionally, Azania does not argue in his habeas petition or in his traverse that there is cause and prejudice to excuse his failure to present this claim to the state courts. Accordingly, his claim that the jury selection system in effect in Allen County in 1982 improperly excluded African-Americans from his guilt phase jury is procedurally defaulted.

### D.  Whether Azania Was Prejudiced by the Selection of a Jury That Was "Death Qualified"

In ground four of his petition for writ of habeas corpus, Azania asserts that "[i]t was improper to death qualify the 1982 jury since the jury was charged with only making a 'recommendation' of death." (DE # 1 at 31.) He presented this claim to the Indiana Supreme Court in his direct appeal.

Respondent argues that this claim is procedurally defaulted because Azania did not make any such argument to the Indiana Supreme Court. (DE # 17 at 22.) Although

this portion of Azania's direct appeal brief is confusing and poorly drafted, it does appear that Azania did argue that he was pejudiced by the "practice within [the] state of excluding persons from [the] jury selected to determine guilt or innocence merely because [the] jurors had some sentimental reservation against capital punishment, without any determination that their beliefs would affect their ability to decide [the] issue of culpability" (DE # 16-6 at 47.) Moreover, the Indiana Supreme Court believed that Azania raised this issue because it addressed this claim in its decision. *Averhart*, 470 N.E.2d at 681-82.

Respondent also argues that this claim is moot because Azania is no longer under sentence of death. (DE # 17 at 22.) But Azania's argument is that the exclusion of jurors based on their opposition to the death penalty resulted in a jury more likely to convict him, which goes toward his conviction and is therefore not moot.

In the alternative, respondent argues that when it addressed this claim, "the Indiana Supreme Court correctly applied clearly established federal law to Azania's suggestion that his jury was 'death qualified.'" (*Id.*). The Indiana Supreme Court observed that Averhart claimed error in permitting *voir dire* of the petit jury to include "death qualifying" questions that would be impermissible pursuant to *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Adams v. Texas*, 448 U.S. 38 (1980). The Indiana Supreme Court found that:

> Most of the prospective jurors excused for cause in *Witherspoon* had only expressed some degree of disagreement with or scruples against the death penalty. *Witherspoon* held that such general disagreement on the death penalty without inquiry to determine that the jurors could or could not vote to impose it in a proper case was impermissible. In this case, only six

potential jurors were excused for cause on this basis. Every one of them had unequivocally stated that they could never recommend the death penalty no matter what the facts were. Notably there were many potential jurors who had reservations or doubts about the death penalty but who said that these reservations would not necessarily compel a vote against recommending it. These jurors were not excused for cause.

*Averhart v. State*, 470 N.E.2d at 682.

In order to prevail on this claim, Azania would have to establish that the Indiana Supreme Court's adjudication was an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). But nothing he has presented suggests that the Indiana Supreme Court unreasonably applied clearly established federal law when it rejected this claim. Azania's argument on this issue therefore fails.

### E.      Whether the Guilt Phase Jury Was Exposed to Prejudicial Victim Impact Evidence

In ground five of his petition for writ of habeas corpus, Azania asserts that in the guilt phase of his trial, the jury was improperly exposed to prejudicial victim impact evidence. (DE # 1 at 31-32.) He states in his petition that:

The emotional representations of Yaros's family was [sic] used as evidence in this case, such as touching photos of Yaros with his granddaughter in contrast to the photo of him on an autopsy table. . . . [T]he first witness called by the State was Ann Yaros. The jury was permitted to view these photos as well as Yaros's badge, within a very few minutes of each other.

(*Id.* at 32.) Azania raised this claim in his direct appeal.

Azania asserts that he was prejudiced by a "touching" photograph of Officer Yaros with his granddaughter. (*Id.*) The Indiana Supreme Court noted that:

The only objection made at the time the photograph was offered into evidence was that there was improper authentication and no relevancy to the

22

> crime. Averhart now claims that the photograph was improperly admitted
> in that it was unduly prejudicial because it showed the victim in a family
> setting with a young granddaughter

*Averhart v. State*, 470 N.E.2d at 685. The Indiana Supreme Court concluded that Azania

had waived this issue, and that because he "did not object to the prejudicial character of

the photograph at the time of its admission he does not have available to him such

objection here." *Id.* Because the Indiana Supreme Court relied on the doctrine of waiver

to reject Azania's claim related to the photograph of his victim with his granddaughter,

and because he does not assert cause and prejudice and has no actual innocence

argument, that claim has been procedurally defaulted. *Gray v. Hardy*, 598 F.3d 324, 329

(7th Cir. 2010) ("If a state court clearly and expressly states that its judgment rests on a

state procedural bar and does not reach the merits of a federal claim, then we are unable

to consider that claim on collateral review.").

Azania also asserts that a photograph of Officer Yaros on the autopsy table

prejudiced him. (DE # 1 at 32.) Azania did present this claim to the Indiana Supreme

Court, which stated that:

> The autopsy photographs show the body from the hip to the neck and
> demonstrate the gunshot wounds on the body of Yaros. They do not
> depict autopsy incisions, internal organs, or surgical instruments.
> Markings on the photograph showed the path of bullets that indicate
> entrance and exit injuries. Although such photographs are by their very
> nature gruesome to view, it cannot be said that the court abused its
> discretion in determining that the probative value of these photographs
> outweighed their inherent prejudicial effect on the passions of the jury.
> We therefore find no error in regard to the admission of any of these
> photographs.

*Averhart*, 470 N.E.2d at 685 (citation omitted) . The Indiana Supreme Court reasonably adjudicated the autopsy photograph claim, and Azania has not shown that the Indiana Supreme Court's adjudication was contrary to clearly established federal law.

### F. Whether the Jurors Saw Azania in Ankle Weights and if So, Whether it Prejudiced Him

In ground six of his petition for writ of habeas corpus, Azania asserts that he was prejudiced when the jury saw him in ankle weights, which he refers to as "shackles." (DE # 1 at 33.) He raised this claim to the state courts in his direct appeal. The Indiana Supreme Court determined that the ankle weights were not shackles and that, in any event, there was no evidence that the jury saw Azania wearing the ankle weights:

> Ankle lock weights are weighted objects attached to the ankles of the defendants. They are not joined together and do not generally interfere with the physical movement of the leg. Their purpose is to slow down a person so that he is not able to run because of the weight applied to each leg. They are so designed that they can be completely covered and concealed by the lower part of the trouser leg and the evidence indicates that they were so concealed in this case. Neither the record nor these defendants indicate the jury was ever aware of the presence of the ankle lock weights on the defendants.

*Averhart*, 470 N.E.2d at 686.

This court must presume as correct the facts as found by the state courts. 28 U.S.C. § 2254(e)(1); *Mata*, 449 U.S. at 546-47; *Ruvalcaba*, 416 F.3d at 559–60. Accordingly, the Indiana Supreme Court's finding that the jurors did not see Azania in ankle weights is controlling unless the Petitioner meets his burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Chandler*, 416 F.3d at 559–60.

Azania presents nothing that would justify a finding that the Indiana Supreme Court incorrectly found that the jurors did not observe Azania in ankle weights. Accordingly, the Indiana Supreme Court's factual findings preclude habeas relief on this claim.

### G. Whether Azania Was Prejudiced by the Denial of His Motion for Severance

Azania and his two accomplices were tried together in a single trial. Each of the Defendants filed separate motions for severance. In ground seven of his petition for writ of habeas corpus, Azania asserts that he was prejudiced by the denial of his motion for severance. (DE # 1 at 33.) He presented his sufficiency of the evidence argument to the state courts in his direct appeal. The Indiana Supreme Court concluded that:

> In the instant case no defendant took the stand nor did any defendant make an out-of-court statement. Not one of the defendants implicated the other and there was no pattern of co-defendants questioning that tended or attempted to single out any one of them as the trigger man. Though the facts show by the testimony of eye witnesses, that Averhart was clearly the one that shot the fatal blow, this was not emphasized or brought out by Hutson and North in their presentation of evidence or cross- examination of State's witnesses. All of the testimony emphasized that the three men worked in concert even including the firing upon Yaros as they left the Bank. The State claims each bore responsibility for their actions, as well as those of their accomplices, and obviously tried the case on the theory of vicarious liability, claiming all three shared equally in guilt for the fatal shot. Since none of the defendants took the stand or made an out-of-court statement or attempted to frame their defense to single out any one of them as the "trigger man," no grounds were presented to the trial court concerning Ind. Code § 35-3.1-1-11(b) (Burns Repl. 1979) that required the court to give them separate trials. Furthermore, since there is no showing that any one of them was prejudiced by such development in the trial, they failed to show an abuse of discretion in the trial court on this issue.

*Averhart*, 470 N.E.2d at 680 (citation omitted).

In his petition for writ of habeas corpus, Azania argues that "The State Court ruling resulted in a decision that was contrary to federal law, or involved an unreasonable application of Federal law," and that the Indiana Supreme Court's "decision was based on an unreasonable determination of the facts." (DE # 1 at 33.) He does not, however, cite any United States Supreme Court opinions in support of this proposition, and the term "clearly established federal law" refers only to the holdings of the United States Supreme Court's decisions in effect at the time of the relevant state-court decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006).

Azania asserts that the Indiana Supreme Court's "decision was based on an unreasonable determination of the facts." (DE # 1 at 33.) But he does not present any argument, either in his petition or in his traverse, that supports the proposition that the statement of the facts stated in *Averhart v. State*, 470 N.E.2d at 680, are not a correct and accurate factual determination. In reviewing a habeas petition, this court must presume as correct the facts as found by the state courts. 28 U.S.C. § 2254(e)(1); *Mata*, 449 U.S. at 547. Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Ruvalcaba*, 416 F.3d at 559–60, and he has not met that burden.

## H.     Sufficiency of the Evidence

 In ground eight of his petition for writ of habeas corpus, Azania asserts that his "conviction was obtained on less than sufficient evidence" (DE # 1 at 34) because "the State failed to prove all elements of the charged offense." (*Id.*) He raised this claim to the state courts in his direct appeal. The Indiana Supreme Court concluded that:

We already have set out enough facts in this opinion to demonstrate that there was strong and convincing evidence before the jury justifying their rendering the guilty verdict. Although Appellant Averhart claims much of the evidence linking him to the killing is circumstantial, it nonetheless establishes his guilt of the robbery and murder by knowingly and intentionally killing Officer Yaros. Witnesses in the Bank described the general appearance and clothing of one of the robbers as being "in a blue suit." He was described as the one who had the .44 Magnum which killed Yaros, and the man who shot from the car window and then escaped on foot. The car from which he fled was apprehended by the police and in it were found Hutson and North, along with all of the items taken from the Bank. He was followed immediately by Officer Oliver who captured him. Although he was out of Oliver's sight for a few moments, he was identified during this period by a witness as the same blue suited man who emerged from the yard in which he was being pursued by Oliver. The witness saw the blue suited man exhibit very strange behavior and saw him remove his coat and gloves and put them under a bush from which they were later recovered. Upon recovering the items, a .38 caliber gun was found, which was the one taken from the Bank guard during the robbery. The foot chase also went through the back lot of a supermarket. That same afternoon the security guard for the supermarket found a pistol behind his store. It was the same type (.44 Magnum) and of very similar appearance to the one used in the robbery. The pistol was connected to Averhart by the man who sold it to him and it was shown by ballistics tests to have fired the fatal shot into Yaros' body. Averhart's attack on several of these items of evidence does nothing more than argue as to their credibility and weight. This, of course, is not a proper consideration for this Court as the jury makes those determinations. No question of error is presented on this issue.

*Averhart*, 470 N.E.2d at 693-94.

The standard for sufficiency of the evidence claims on federal habeas review is that a petitioner is "entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Cabrera v. Hinsley*, 324 F.3d 527, 533 (7th Cir. 2003) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)). The evidence set forth by the Indiana Supreme Court goes far beyond that necessary to satisfy the *Jackson* standard. Indeed,

the evidence of Azania's guilt is overwhelming. Accordingly, Azania's challenge to the sufficiency of the evidence is without merit.

## I. Whether the State Suborned False Testimony

In ground nine of his petition for writ of habeas corpus, Azania asserts that the State suborned testimony from witness James McGrew. (DE # 1 at 35.) He raised this claim to the state courts in his appeal from the denial of his successive petition for post-conviction relief.

A conviction obtained through use of false evidence, known to be such by representatives of the State, violates the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). McGrew testified at trial that after the robbery, he saw Azania discard items into a bushy area. These items were later tied to the robbery of the Gary National Bank and murder of Officer Yaros. "McGrew positively identified Azania as the man who placed the objects in the bushes." *Azania*, 778 N.E.2d at 1262. During Azania's successive post-conviction review in 1996, "McGrew recanted his earlier testimony" that he could identify Azania as the man he saw dispose of clothing and the weapon taken by the robbers from security guard Bourseir at the Bank. *Id.* Azania asserts that McGrew's recantation showed that he gave false testimony and that the prosecutor knew McGrew's testimony was false and did not correct it. (DE # 1 at 35.)

The post-conviction court rejected this claim, and the Indiana Supreme Court found on appeal that:

> The successive post-conviction court considered all this evidence and held
> that McGrew's deposition testimony was not credible and accordingly did

not satisfy the nine-prong test for newly discovered evidence mandating a new trial. Substantial evidence contradicts McGrew's recantation of his trial identification. First, as is true of all recanted testimony, McGrew's 1982 trial testimony directly contradicts his current claims. Second, his current claims contradict his statements to police at the time of Azania's apprehension and to Nardini the next day. Third, his claim that he was intimidated by an armed man is contradicted by Fruchey. This issue turns on credibility of witnesses. The successive post-conviction court viewed McGrew and the other post-conviction witnesses and found that his recantation was not credible. That finding is not clearly erroneous, and is accordingly affirmed.

*Azania*, 778 N.E.2d at 1262-63 (citation omitted).

To grant relief a federal habeas court must find the state court's determination to be "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). State-court factual findings are presumed to be correct, and the habeas applicant has the burden of rebutting that presumption by "clear and convincing evidence." § 2254(e)(1). As the Indiana Supreme Court correctly observed, this issue turns upon the trial court's credibility determinations. *Azania*, 778 N.E.2d at 1263. The State Supreme Court concluded that the trial court's determination was supported by the evidence, and Azania has not rebutted the Indiana Supreme Court's factual findings supporting the conclusion that McGrew's recantation is not credible.

### J.     Whether Azania was Prejudiced by Pre-Trial Publicity in Allen County

In ground ten of his petition for writ of habeas corpus, Azania asserts that his right to a fair trial was violated by prejudicial pretrial publicity. (DE # 1 at 36.) He states in his petition that:

The police and prosecutor leaked unsubstantiated information to the news media that devoted particular attention to the material that incriminated and

29

prejudiced Azania. There had been a "gag order" directing the parties to refrain from publicly discussing the facts of this case. There was as much prejudicial publicity in the Fort Wayne area as in the Gary area which originally warranted the change of venue.

(*Id.*) Azania raised this claim to the state courts in his direct appeal.

The bank robbery and the murder of Officer Yaros occurred in Lake County, but "a change of venue from the county was granted and the cause was venued to Allen County which is across the State from Lake County, a distance of more than one-hundred miles." *Averhart*, 470 N.E.2d at 682. There is no record of a gag order, such as that described by Azania in his habeas petition, having been issued by the Allen Superior Court.

In regard to the amount of publicity in the Allen County area, the Indiana Supreme Court concluded that "[n]one of the media sources of the Lake County area, including the Chicago TV stations and newspapers, circulate in the Allen county area and jurors were totally unaware of any such publicity." *Id.* The Indiana Supreme Court concluded that there was "a total lack of showing by Averhart that the jury was in any way tainted by pretrial or in-trial publicity or that there was any prejudice in the community that would prevent the defendant from receiving a fair trial by jurors in that community." *Id.* at 683. These factual findings are presumed to be correct, § 2254(e)(1), and Azania has not rebutted the Indiana Supreme Court's factual finding that there was not extensive evidence supporting the conclusion that there was extensive prejudicial publicity in the Fort Wayne area.

**K.      Whether the State Withheld Exculpatory Evidence that Would Have Undermined Confidence in the Outcome of the Guilty Phase of Azania's 1982 trial.**

In ground eleven of his petition for writ of habeas corpus, Azania asserts that his right to a fair trial was violated because the State withheld exculpatory evidence. (DE # 1 at 37.) He raised this claim to the Indiana Supreme Court in his first post-conviction proceeding.

A criminal defendant has a due process right to receive from the prosecution evidence favorable to the defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* violation occurs when the prosecution suppresses material evidence — including exculpatory and impeachment evidence — that is favorable to an accused:

> There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The Indiana Supreme Court granted Azania relief on this claim as it pertained to his death sentence, applying *United States v. Bagley.* The Indiana Supreme Court stated that:

The prosecution did not inform defense counsel, in response to a specific request for the results of scientific tests, that it had received a written report of a gunshot residue test reporting that no particles of gunshot residue were found on the disks which had been daubed on appellant's hands. Appellant alone received the death sentence by the judge. That sentence, in turn, is based upon the factual conclusion reached by the jury at its sentencing hearing that it was appellant, and not one of his two accomplices, who returned to the fallen officer and fired the fatal shot into him. That was not a necessary conclusion for the jury to reach in returning the verdicts of guilty, but it was at the sentencing hearing.

*Averhart*, 614 N.E.2d at 931.

The Indiana Supreme Court found that "[c]onfidence in the manner in which the jury evaluated the aggravating circumstances with respect to appellant cannot be maintained in this atmosphere." *Id.* Because it found a reasonable probability that this evidence might have prevented Azania from being sentenced to death, the Indiana Supreme Court reversed the post-conviction court's denial of relief and remanded the case for a new jury sentencing proceeding. *Id.*

But, that the Indiana Supreme Court concluded that the withholding of the gunshot residue test undermined the finding that Azania was the trigger man, thereby also undermining the decision to impose the death penalty, does not mean that it also undermines the conviction itself. For purposes of the conviction for robbery and felony murder, it does not matter whether Azania was the person who fired the shot that killed Officer Yaros. As the Indiana Supreme Court correctly observed:

It cannot be said that the inconclusive tests are exculpatory of appellant and his accomplices. This is especially true when one examines the photographs, including the photographs taken a few seconds before the victim was shot, in which it is apparent that each of the robbers was wearing gloves at the

time of the robbery. Under those circumstances, the State was entitled to presume that the gunshot residue tests were of no value.

> From the evidence in this case, including the photographs taken by the bank security camera, the jury was entitled to find that the defendants were in fact the robbers, that each of the robbers fired shots, and that each of them was wearing gloves at the time. In light of the State's vicarious liability theory, we hold no reversible error occurred at the guilt phase by the State's withholding of that information.

*Averhart*, 614 N.E.2d at 928.

Azania's test result was not incriminating because it did not establish that Azania fired his weapon; but neither was his test result exculpatory because the gloves Azania wore prevented the test from establishing that he did not fire his weapon during the course of the robbery, or even preclude him from being the "trigger man" who actually killed Officer Yaros. Given the facts and circumstances of the case, the Indiana Supreme Court reasonably applied clearly established federal law and correctly concluded that the gunshot residue evidence was not material to a determination of Azania's guilt and that it could not have caused a reasonable probability of acquittal on the charges against him.

### L.     Whether Azania Was Denied the Right to Confront His Accusers

In ground twelve of his petition for writ of habeas corpus, Azania asserts that the trial court violated his right to confront his accusers. (DE # 1 at 39.) By this, Azania means that the trial court refused to allow him to personally question witnesses at his trial and address the jury. (*Id.*) In his habeas petition, Azania contends that the trial court's ruling in this regard violates the Constitution's Sixth Amendment's Confrontation Clause, citing *Davis v. Alaska*, 415 U.S. 308 (1974). (*Id.*)

Azania did not invoke *Davis* or the Confrontation Clause in his appeal to the Indiana Supreme Court (DE # 16-5 at 69-70), nor does he assert cause and prejudice for not having done so or assert actual innocence. Accordingly, his *Davis* confrontation claim is procedurally defaulted. *Perruquet*, 390 F.3d at 514.

In his direct appeal, Azania did argue that, pursuant to *Faretta v. California*, 422 U.S. 806 (1975), the trial court should have responded to his request to personally question witnesses at his trial and address the jury by inquiring more fully into whether he wished to proceed without counsel and represent himself. (DE # 16-5 at 69-70.) The Indiana Supreme Court found that:

> During the trial both Averhart and Hutson indicated they wished to address the jury personally and put questions to witnesses before the jury. Neither of them made any indication that they wished to proceed pro se. The Court denied permission to Averhart and Hutson to personally ask questions of the witnesses or address the jury, but directed them to discuss with their counsel what questions they believed should be put to the witnesses. Averhart and Hutson both claimed infringement of their rights to self-representation by the manner in which the court handled these situations.
>
> Since these requests asked leave of the court to perform self- representational acts while also enjoying assistance of court appointed counsel, they were actually requests to have hybrid representation. There is no constitutional right to such hybrid representation and a trial court may, in its discretion, deny a motion requesting creation of such a scheme.

*Averhart v. State*, 470 N.E.2d at 689 (citations omitted).

Azania asserted on appeal "that the trial court, upon receiving this motion, had a duty to determine whether Defendant really wanted pro se representation and the court was therefore duty bound to make an investigation as to Averhart's true intentions." *Id.* The Indiana Supreme Court held that *Faretta* did "not require any such inquiry. Before

such a right is deemed invoked, its assertion must be clear and unequivocal and must be timely made." *Id.*

Azania asserts in his petition for writ of habeas corpus that "[t]he State Court identified the correct governing rule, but unreasonably applied it to the facts of Azania's case." (DE # 1 at 39.) The Indiana Supreme Court did identify *Faretta* as governing this claim. In *Faretta*, the Supreme Court held that a state court had deprived the defendant of his right to represent himself when "weeks before trial, [the defendant] clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel." *Faretta*, 422 U.S. at 935-36.

After citing *Faretta*, the Indiana Supreme Court concluded that Azania and Hutson "did not clearly and unequivocally assert that they desired to proceed *pro se.*" *Averhart v. State*, 470 N.E.2d at 689-90. Indeed, Azania does not argue in his habeas petition that he wanted to proceed *pro se* in his criminal trial. Averhart and Hutson's "only request was to subsidize the efforts of their counsel by asking questions of witnesses and addressing the jury." *Id.* at 690. The Indiana Supreme Court correctly identified *Faretta*, as the controlling federal law, and also correctly applied *Faretta* to the circumstances of Azania's case.[5]

---

[5] Additionally, Azania has not directed the court to any case law indicating that a defendant should be allowed to question witnesses or summarize his or her case to the jury when represented by counsel.

**M. Whether Azania Was Prejudiced when the Trial Court Refused to Let Him Use the State's Closing Argument from the Guilt Phase of His 1982 Trial as Evidence at the Penalty Phase of his Trial on Remand**

In ground thirteen of his petition for writ of habeas corpus, Azania asserts that during his second sentencing phase hearing, the trial court violated the Fourteenth Amendment's Equal Protection clause when it "denied him the right to admit the State's argument into evidence in his case in chief." (DE # 1 at 40.) He presented this argument to the Indiana Supreme Court in his appeal from his resentencing after the Indiana Supreme Court set aside his death sentence in *Averhart v. State*, 614 N.E.2d 924 (Ind 1993).

The Indiana Supreme concluded that:

> The defendant was not seeking to offer factual evidence from the 1982 trial but rather the prosecutor's final argument regarding the evidence. Even if the 1982 closing statements may be relevant to the issue of the credibility of the State's 1996 argument, they were not relevant to the 1996 evidence in the penalty phase retrial. The mere fact that a party earlier argued a different theory based on different evidence does not render the argument relevant to the issues presented in the later proceeding. The trial court did not err in refusing to admit the prosecutor's prior closing arguments.

*Azania*, 730 N.E.2d at 654.

Azania bases this claim on his argument that the State had "changed the facts and theory of the prosecution as to the cause of the death of the victim, George Yaros, prejudicing Azania's right to notice of particulars of the charges against him." (DE # 1 at 40). Azania presented this same argument in ground one of his petition, and this court has already reviewed and rejected that argument. (*See supra* pp. 12-14.) The State did not improperly amend the charging information, changing the theory of the

offenses with which Azania was charged. Accordingly, Azania's argument that on remand he needed to place the State's final argument at his original trial into evidence in order to establish that the State improperly changed the charges against him is without merit.

### N.     Whether the Trial Court Erroneously Instructed the Jury as to the Elements of the Charged Offenses

In ground fourteen of his petition for a writ of habeas corpus, Azania argues that he "was denied his right to a fair trial when the trial court erroneously instructed the jury as to the essential elements of the charged offenses." (DE # 1 at 41.) Respondent argues that Azania procedurally defaulted this claim because he did not raise it to the Indiana Supreme Court after he was re-sentenced pursuant to his stipulated sentencing agreement of October 17, 2008. (DE # 17 at 42.) However, respondent also "recognizes that Petitioner's stipulated sentencing agreement states that 'This agreement does not prevent the defendant from raising any issues in federal court.'" (*Id.* at n. 4.)

> Inherent in the habeas petitioner's obligation to exhaust his state court remedies before seeking relief in habeas corpus, *see* 28 U.S.C. § 2254(b)(1)(A), is the duty to fairly present his federal claims to the state courts . . . . Fair presentment in turn requires the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings. This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory.

*Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004) (internal citations and quotation marks omitted). However, there is not a requirement that a petitioner raise his claims

twice in the State courts. Therefore, this claim is not procedurally defaulted merely because he did not raise it a second time.

However, it is procedurally defaulted because when he raised it, the Indiana Supreme Court held that "trial counsel for the Petitioner failed to object to any of the instructions given to the jury at the conclusion of the case." *Averhart v. State*, 614 N.E.2d 924, 934 (Ind. 1993). "An adequate and independent state ground bars federal habeas review of constitutional claims only if the last state court rendering judgment in the case clearly and expressly states that its judgment rests on the state procedural bar." *Harrison v. McBride*, 428 F.3d 652, 664 (7th Cir. 2005) (citations and quotations omitted). Such is the case here even though the Indiana Supreme Court also went on to explain that there were other reasons to reject this claim. The Indiana Supreme Court explained, "[i]n addition to the lack of a sound argument on the merits and the lack of an objection to the court's instruction as required by Ind. Trial Rule 51(C), noted above from the post-conviction court's findings, there is additional reason to reject this ground as a basis for post-conviction relief." *Averhart*, 614 N.E.2d at 935. Thus, despite having identified other reasons for denying Azania relief on this claim, the Indiana Supreme Court clearly and expressly stated that its judgment rested on a State procedural bar and "a state court need not fear reaching the merits of a federal claim in an alternative holding." *Harris v. Reed* , 489 U.S. 255, 264 n.10 (1989).

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure.

*Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" that prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). A petitioner may also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Under this narrow exception, a habeas applicant must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). A petitioner who asserts actual innocence "must *demonstrate* innocence; the burden is his, not the state's . . . ." *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) (emphasis in original). "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Here, Azania has not argued that he has either cause or prejudice to excuse this procedural default and (as previously explained) he cannot sustain a claim of actual innocence. Therefore ground fourteen does not present a basis for habeas corpus relief.

### O. Whether Azania's Trial Counsel was Ineffective

In ground fifteen of his petition for writ of habeas corpus, Azania asserts that his trial counsel was ineffective. (DE # 1 at 42-43.) Azania specifically alleges that his trial counsel:

failed to meaningfully put the State's case to its test. This failure is directly attributable to his failure to meaningfully investigate and prepare. He breached his duty to investigate, to prepare to rebut the State's case and his conduct fell below prevailing professional norms of reasonably competent counsel.

(*Id.* at 43.) Azania raised this issue in his first petition for post-conviction relief.

Where a habeas petitioner asserts ineffectiveness of counsel under the Sixth Amendment, the governing Supreme Court case is *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a habeas applicant "to establish that his counsel's performance fell below an objective standard of reasonableness, and [that] this deficiency actually caused prejudice." *Martin v. Evans*, 384 F.3d 848, 851 (7th Cir. 2004) (citing *Strickland*, 466 U.S. at 687-88). To satisfy the first prong of the *Strickland* test, a habeas applicant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. *Williams v. Taylor*, 529 U.S. 362, 390 (2000). In considering counsel's performance, a reviewing court "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

To satisfy the *Strickland* test's second prong, a habeas petitioner must show that there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Indiana Supreme Court properly identified the *Strickland* standard as governing the resolution of Azania's ineffective assistance of trial counsel claims. *Averhart*, 614 N.E.2d at 928-30. The Indiana Supreme Court agreed with Azania that his

trial counsel had been ineffective for failing to investigate and present evidence of

mitigating circumstances to the jury, and that the evidence presented at the post-

conviction hearing of Azania's "extreme disadvantage, as well as his worthy habits and

accomplishments" showed Azania's "trial counsel's performance in preparing for and

conducting his client's case at the sentencing was deficient[.]" *Id.* at 930-31. The Indiana

Supreme Court reversed the denial of post-conviction relief on this ground, and

remanded the case for a new death sentence hearing. *Id.* But this finding is moot as to

this habeas petition because it dealt only with the original penalty phase at which he

was sentenced to death.

The Indiana Supreme Court, however, concluded that Azania's trial counsel had

not rendered ineffective assistance during the guilt phase of the trial. *Id.* at 928-29. The

court noted that Azania's trial counsel was faced with an exceedingly difficult task in

attempting to present a defense because the identification of all three robbers, including

Azania, was overwhelming:

> The trial record in this case consists of nearly three thousand pages. When
> viewed overall, it becomes apparent that appellant's counsel defended him
> properly at the guilt stage. In a case of such magnitude, it is virtually
> impossible for counsel to have operated perfectly in every respect. This
> reality was recognized by the United States Supreme Court in *Strickland*. It
> has been held repeatedly that a defendant is not entitled to a perfect trial, but
> is entitled to a fair trial, free of errors so egregious that they, in all
> probability, caused the conviction.
>
> * * *
>
> Notwithstanding the competency and hard work of the trial, appellate, and
> post-conviction counsel, the evidence of guilt in this case is so overwhelming
> that it is unrealistic to expect the relief prayed for under this section of
> appellant's brief.

*Id.* at 928-29 (citation omitted).

A Federal court may grant habeas relief if a state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins*, 539 U.S. at 520. To support a claim of ineffective assistance of counsel on habeas review, Azania must show that the state court's application of *Strickland's* attorney-performance standard was objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 702 (2002).

The strongest ineffective assistance of counsel claim presented by Azania's habeas petition is an allegation that his counsel ignored the testimony of Kenneth Houck, a firearms expert, who Azania believes refuted the State's "alleged theory of visual distance determination execution-style killing because, in order to determine the distance from which a firearm is discharged[,] a scientific procedure is used." (DE # 1 at 43.) But even assuming that Houck's testimony was as powerful as Azania believes, it does not even suggest that he was not involved in the robbery of the Gary National Bank and killing of Officer Yaros. Houck's testimony does not even preclude Azania as the triggerman who actually killed Officer Yaros. Houck's evidence was not material to a determination of Azania's guilt and could not have caused a possibility, let alone a reasonable probability, of acquittal on the charges against him.

The evidence overwhelmingly showed that Azania participated in both the robbery of the Gary National Bank and the killing of Officer Yaros. Azania's submissions do not come close to meeting either prong of the *Strickland* test. This court concludes that the Indiana Supreme Court correctly applied the standards of *Strickland* to the facts of this case and that Azania has not met his burden of establishing either

that his counsel's performance was deficient, or that had his counsel performed differently there existed a reasonable probability of a different outcome.

### P.  Whether Azania's Appellate Counsel Was Ineffective

In ground sixteen of his petition for writ of habeas corpus,[6] Azania asserts that his appellate counsel was ineffective. Azania specifically alleges that his "[a]ppellate counsel did not know the law governing the availability of issues on direct appeal." (DE # 1 at 44.)

Azania argues in his petition that his appellate counsel was unaware that he could raise "conspiracy, official misconduct, perjury, false reporting or informing, and obstruction of justice." (*Id.* at 45.) Azania, however, has not cited portions of the record that suggest that he was the victim of conspiracy, official misconduct, perjury,[7] false reporting or informing, and obstruction of justice, nor did he argue to the Indiana Supreme Court that he was the victim of conspiracy, official misconduct, perjury (with the exception of James McGrew's recanted trial testimony), false reporting or informing, or obstruction of justice.

"Generally speaking, the performance of appellate counsel is assessed using the same standards applied to trial counsel under *Strickland v. Washington*." *Mason v. Hanks*, 97 F.3d 887, 892-93 (7th Cir. 1996). "When a claim of ineffective assistance of counsel is

---

[6] This ground is listed in Azania's petition for writ of habeas corpus as ground one under the heading "Azania's rights . . . were violated during his direct appeal and thereafter." (DE # 1 at 44.)

[7] Azania does mention James McGrew's trial testimony, which he later recanted, a claim that has already been discussed by this court. (*See supra* pp. 28-29.)

based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986). Appellate counsel, however, is not required to argue every nonfrivolous issue; rather, counsel is entitled to, and should, select for argument the strongest issues while omitting the rest. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). "The failure of appellate counsel to raise an issue on appeal requires the court to compare the issue not raised in relation to the issues that were raised; if the issue that was not raised is 'both obvious and clearly stronger' than the issues raised, the appellate counsel's failure to raise the neglected issue is objectively deficient." *Sanders v. Cotton*, 398 F.3d 572, 585 (7th Cir. 2005) (citing *Lee v. Davis*, 328 F.3d 896, 900-01 (7th Cir. 2003)).

The Indiana Supreme Court correctly applied these standards in concluding that Azania's appellate counsel had not been ineffective:

> Appellant alleges his appellate counsel in his original appeal was ineffective and claims he demonstrated a lack of ability to "present errors of fundamental magnitude not reserved in the motion to correct error." Here, as in the case of the trial counsel, appellant engages in a lot of second-guessing as to what his counsel might have done in preparing appellant's appeal.
>
> However, an examination of this record shows that appellate counsel raised twenty-three separate errors for this Court to determine in the original appeal. This Court's opinion was in excess of twenty-three pages and covers most of the issues which appellant now attempts to raise in this appeal. There is no indication that appellant received ineffective assistance from counsel on his original appeal.

*Averhart*, 614 N.E.2d at 931-32.

Azania does not direct this court to any issue not raised by appellate counsel that is "both obvious and clearly stronger" than the issues actually raised by his appellate counsel. Azania has also failed to establish that the Indiana Supreme Court's adjudication of his appellate counsel claims was an unreasonable application of clearly established federal law. This court concludes that the Indiana Supreme Court correctly applied the standards of *Strickland* to the facts of this case and that Azania has not met his burden of establishing either that his appellate counsel's performance was deficient, or that had his appellate counsel performed differently there existed a reasonable probability of a different outcome. Azania's claim therefore fails.

### Q. Whether the Fifth Amendment's Double Jeopary Clause Precluded Azania from Being Re-Sentenced in the Penalty Phase After His Death Penalty Was Set Aside

In ground seventeen of his habeas petition,[8] Azania asserts that being re-sentenced after his death penalty was set aside violated the Fifth Amendment's double jeopardy clause. (DE # 1 at 45.) He specifically asserts that a "verdict on a species of lesser included offense of the underlying felony, based upon the same elements test, constitutes an implied acquittal barring retrial on the sentence for the greater offense[.]" (*Id.*)

---

[8] This ground is listed in Azania's petition for writ of habeas corpus as ground two under the heading "Azania's rights . . . were violated during his direct appeal and thereafter." (DE # 1 at 45.)

Azania argued this claim to the Indiana Supreme Court in a *pro se* brief. (DE # 16-22 at 16-21.) In this portion of his *pro se* appellate brief, Azania quoted the instruction given by the trial court regarding the imposition of the death penalty:

> "The law provides for the penalty of death upon conviction for the crime of murder under the following circumstances. The defendants, one committed the murder by intentionally killing the victim while committing or attempting to commit robbery; or, two, the victim of the murder was a law enforcement officer and was acting in the course of duty."

(*Id.* at 16-17.) He then argued that the instruction given by the trial court on when the death penalty could be imposed was incorrect, and that:

> It would be erroneous and a violation of Petitioner-Defendant's fundamental constitutional rights to due process and equal protection of the law for the court to be allowed to conduct another jury and judge sentencing hearing at which the State seeks the death penalty again . . . .

(*Id.* at 17.)

Azania's argument to the Indiana Supreme Court was directed solely toward whether or not the State could seek the death penalty in a second sentencing phase after his first death penalty had been set aside. Because Azania is no longer under sentence of death, but is serving a sentence for a term of years, this argument is moot. Because Azania couched this argument to the Indiana Supreme Court solely on the question of whether he could be put in jeopardy of a death sentence a second time, he may not now argue to this court that he could not be re-sentenced to a term of years after his death penalty was set aside.

In any event, this claim has no substantive merit, as the retrial on the penalty phase did not implicate Double Jeopardy concerns. The Double Jeopardy Clause

"protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *United States v. Wilson,* 420 U.S. 332, 342-43 (1975) (citations and quotations omitted). There were no "subsequent prosecutions" on any underlying charge of criminal conduct, but only retrial on the penalty phase to determine whether the appropriate sentence for Azania was death or another punishment. Additionally, Azania was not given multiple punishments for the same offense.

As the Indiana Supreme Court noted, "[a]t a new penalty phase hearing, the jury would be asked to make three determinations: (1) whether the State has proved beyond a reasonable doubt the existence of the charged aggravating circumstances; (2) whether the aggravating circumstances outweigh any mitigating circumstances; and (3) whether Azania should be sentenced to death or a term of years. I.C. § 35-50-2-9 (1982)." *Azania*, 865 N.E.2d at 1006 (footnote omitted). The evidence that the State produced regarding Azania's fourteen-year agreed sentence on one count of class B felony robbery as a lesser-included offense of felony murder is supported by overwhelming evidence, and neither Azania's conviction nor his sentence violate the Double Jeopardy Clause.

### R. Whether Sentencing Azania to a Term of Years After His Death Sentence Was Set Aside Violated His Sixth Amendment Right to a Speedy Trial

In ground eighteen of his petition for writ of habeas corpus,[9] Azania asserts that "the reversal of Judge David's dismissal of Azania's death sentence was in error and in

---

[9] This ground is listed in Azania's petition for writ of habeas corpus as ground three under the heading "Azania's rights . . . were violated during his direct appeal and thereafter." (DE # 1 at 47.)

violation of Azania's constitutional rights and, as a result, Azania was forced to accept the sentencing agreement entered on remand which permitted the State to add an additional 20 years to his sentence." (DE # 1 at 47.)

In early 2005, after the Indiana Supreme Court remanded Azania for yet another resentencing, he asked the trial court to bar the State from seeking the death penalty in the latest penalty phase because of the prejudice he would suffer due to the passage of time. The trial court granted Azania's motion, and ruled that the state was prohibited from seeking the death penalty in the new penalty phase. *State v. Azania*, 865 N.E.2d at 997. The State appealed, and the Indiana Supreme Court reversed the the trial court's determination and remanded the case for yet another penalty phase, at which the State was free to seek the death penalty. *Id.* at 1010. The final resentencing phase resulted in Azania being sentenced to an aggregate term of 74 years pursuant to a stipulated sentencing agreement. (DE # 16-2.)

Azania asserts two claims in ground eighteen of his habeas petition, one of which is that the Indiana Supreme Court's decision to overturn the trial court's determination that he could continue to face the death penalty in the latest penalty phase hearing "ignores the protections against federal ex post facto law." (DE # 1 at 48.) An ex post facto law is "one 'that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action,' or 'that aggravates a crime, or makes it greater than it was, when committed." *United States v. Barton,* 455 F.3d 649, 652 n. 2 (6th Cir. 2006 )(quoting *Bouie v. City of Columbia,* 378 U.S. 347, 353-54 (1964)). "Article I of the United States Constitution provides that neither Congress nor

any State shall pass any 'ex post facto Law.'" *United States v. Robertson,* 662 F.3d 871, 875 (7th Cir. 2011) (citing Art. I, § 9, cl. 3; Art. I, § 10, cl. 1). It does not appear that Azania presented an ex post facto argument to the Indiana Supreme Court. (DE # 16-37). In any event, nothing in the record of this case supports a claim that the State of Indiana violated the Constitution's ex post facto clause in its prosecution of Azania.

Azania's primary claim in this portion of his habeas petition is that he "was penalized for filing appeals while he was facing the death penalty as the cause of the delays in this case." (DE # 1 at 48.) Azania asserts that the Indiana Supreme Court's reversal of the trial court's order that the State could no longer seek the death penalty was in error and that "[t]he delay between conviction and sentencing after reversal on appeal violated Azania's Sixth Amendment right to a speedy trial." (DE # 1 at 47.)

In his last appeal to the Indiana Supreme Court, Azania argued that the delay between his conviction and his sentencing violated his Sixth Amendment right to a speedy trial, that he suffered prejudice because witnesses and evidence were no longer available, and that the trial judge was within his discretion to bar the State from seeking the death penalty on re-sentencing. (DE # 16-37.) Respondent argues that Azania's claim that Indiana Supreme Court's reversal of the trial court's order that the State could no longer seek the death penalty is moot because the decisions of both the trial court and the Indiana Supreme Court dealt only with whether Azania could be re-sentenced to death, and Azania no longer is sentenced to death. (DE # 17 at 51.)

Azania's appellate brief in his last appeal to the Indiana Supreme Court supports respondent's theory that the arguments Azania presented to the Indiana Supreme Court addressed only his claim that the Speedy Trial Clause precluded him from being subjected to the possibility of a sentence of death at that late date. (DE # 16-37 at 36.) Azania argues in his habeas petition that because the Indiana Supreme Court rejected his argument he was "forced to accept the sentencing agreement entered on remand which permitted the State to add an additional twenty years to his sentence." (DE # 1 at 47.) But he points to nothing in the record that supports this argument and, in fact, nothing required Azania to accept a plea bargain at the conclusion of his final sentencing phase proceedings.

Moreover, even if this claim is not moot, the Indiana Supreme Court addressed his claim that the long delay between his initial conviction and the final sentencing phase prejudiced him, and concluded that this argument had no merit. In its review of Azania's last appeal, the Indiana Supreme Court elected "to proceed on the theory that there is a speedy trial right implicated in this case." *Azania*, 865 N.E.2d at 1000, and concluded that:

> [E]ven if the delay in this case does not implicate the Speedy Trial Clause, it clearly does implicate the Due Process Clause. And courts use the *Barker v. Wingo* factors to analyze whether delay has caused a due process violation, even when the speedy trial right is not implicated.

*Id.* at 1001 (citations omitted).

The Indiana Supreme Court applied the principles set forth in *Barker v. Wingo,* 407 U.S. 514 (1972) to the facts of Azania's case, and reversed the trial court's dismissal

of the death penalty. First, the court determined that the trial court had erroneously

attributed the delay to the State:

> During much of the period of time in question, Azania and not the State had the responsibility of going forward. That is, it was Azania's responsibility (1) to prosecute the appeal following the completion of the original trial and imposition of the death sentence; (2) to prosecute his request for collateral review following the conviction and death sentence being affirmed on direct appeal; and (3) to prosecute his subsequent request for collateral review following the reimposition of the death sentence.

> Virtually all of the appellate decisions regarding the speedy trial right involve claims of delay with respect to proceedings in which the State has the burden of prosecution, of going forward. *Barker v. Wingo* is just such a case. Because of this, the default position in *Barker* is that any delay that is not specifically attributable to the defendant is laid at the doorstep of the State. (As noted above, even delay attributable to the State will not be weighted heavily where there is a "valid reason" for it.) But we believe that the default position should be and is reversed when the defendant, rather than the State, has the burden of going forward-as the defendant does when the defendant prosecutes either an appeal or a petition for collateral review.

*Azania*, 865 N.E.2d at 1003.

And secondly, the Indiana Supreme Court determined that Azania had failed to

show prejudice with respect to the delay. The court specifically noted that the delay

created "far greater difficulty for the State to meet its burden of proof, *id. at* 1009,

because:

> In point of fact, every one of the witnesses that Azania specifically identifies as not being available-the four eyewitnesses to the shooting, the ballistics expert, the witnesses inside the bank, and the weapon-linking witness-were all State's witnesses. In *United States v. Loud Hawk*, the United States Supreme Court said, "[D]elay is a two-edged sword. It is the Government that bears the burden of proving its case beyond a reasonable doubt. The passage of time may make it difficult or impossible for the Government to carry out this burden." 474 U.S. at 315, 106 S.Ct. 648. We think that is precisely the result of the unavailability of these witnesses and this evidence. Azania has not

made a showing of prejudice with respect to the unavailability of these witnesses and this evidence.

*Id.* at 1009-10.

Azania fails to show that the Indiana Supreme Court's adjudication of this claim was an unreasonable application of clearly established federal law. This court concludes that the Indiana Supreme Court correctly applied the standards of *Barker v. Wingo* to the facts of this case, and properly adjudicated Azania's speedy trial and due process claims.

### S.	Whether the Post-Conviction Court Failed to Inspect Portions of the State's Files *In Camera*

In ground nineteen of his petition for writ of habeas corpus,[10] Azania asserts that the post-conviction court erred in failing to inspect *in camera* the State's files related to his claims that the State suppressed exculpatory evidence. (DE # 1 at 48.) In August of 1990, the Indiana Supreme Court issued an order remanding Azania's case to the trial court "in order that it might examine appellant's alleged newly-discovered evidence and the police files pertaining thereto." *Averhart*, 614 N.E.2d at 933. "Upon remand, the trial court conducted in camera hearings with both counsel for defendant and the State present," *id.*, and:

> the trial judge, after meticulously exploring each of the many allegations contained in appellant's claims of newly-discovered evidence and improper conduct, made his report to this Court, including his findings of fact and conclusions of law. The trial court considered evidence of thirteen different items, including an unrevealed statement of a prosecution witness, an undisclosed 1948 conviction of a prosecution witness for reckless homicide,

---

[10] This ground is listed in Azania's petition for writ of habeas corpus as ground four under the heading "Azania's rights . . . were violated during his direct appeal and thereafter." (DE # 1 at 48.)

dispatch tapes made at the time of the crime indicating a possible fourth suspect wearing a grey suit, expense payments to prosecution witnesses, a special police escort for two witnesses on the day of trial, joint meetings between the prosecution and two crucial witnesses, and a photo array in the prosecutor's file. Among other things, the trial judge on remand concluded that the items lacked materiality to either guilt or punishment, that they did not demonstrate the use of perjury or other acts of misconduct by the prosecution or police in the nature of suppression, exploitation, or interference with the defense, and that their existence, nature, and handling did not show a denial of federal due process.

*Id.* at 933-34.

The Indiana Supreme Court found that Azania was given "multiple opportunities to identify possible files and evidence in the hands of the prosecution; a specific named officer was designated to gather all of the police files; and the prosecutor assured the trial court that all files had been turned over." *Id.* at 934. The Court found this process adequate, and added that "suffice it to say that the trial judge's detailed work convinces us that appellant's case for a new trial on the question of guilt has not been enhanced by this remand." *Id.*

In his habeas petition, Azania alleges that "[t]he post-conviction court . . . failed to inspect [the] State's files in camera." (DE # 1 at 48.) But the record established that the post-conviction court reviewed all of the State's files *in camera*. Azania further suggests that he was not given evidence and that there was a reasonable probability that had the evidence been disclosed the result of his trial would likely have been different. (DE # 1 at 49). The record, however, does not support this argument. Instead, the record establishes that the post-conviction court carefully examined the materials available to the prosecutor and that the post-conviction court and the Indiana Supreme Court

correctly determined that nothing in the State's files undermined confidence in the outcome of the trial or suggested a reasonable probability of a different outcome.

## V.      Certificate of Appealability

Pursuant to RULE 11 OF THE RULES GOVERNING SECTION 2254 CASES, this court must consider whether to grant Azania a certificate of appealability. To obtain a certificate of appealability, a petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and quotation omitted).

For the reasons stated in this order, this court concludes that all of Azania's claims are either procedurally defaulted or are without merit. Azania has failed to make a substantial showing of the denial of a constitutional right, nor has he established that jurists of reason could debate the correctness of these rulings or find a reason to encourage him to proceed further. Accordingly, the court declines to issue Azania a certificate of appealability.

## VI.     Conclusion

For the foregoing reasons, the court:

(1) **DENIES** the Petitioner's request to expand the record and conduct an evidentiary hearing (DE # 20-2);

(2) **DENIES** the petition for writ of habeas corpus (DE # 1);

(3) **DIRECTS** the Clerk to close this case;

54

(4) **DENIES** the Petitioner a certificate of appealability; and

(5) **DENIES AS MOOT** the Petitioner's request for a ruling on his habeas

petition. (DE # 27.)

**SO ORDERED.**

Date: February 18, 2015

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT